IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | Criminal Action No. |
| v. | : | 2:18-CR-005-RWS-JCF |
| | : | |
| GARY CALEB MEALOR and | : | |
| QUAMANE SHALONE HAYES, | : | |
| | : | |
| Defendants. | : | |

**ORDER and FINAL REPORT AND RECOMMENDATION**

This matter is before the undersigned on Defendant Mealor's Motion To Suppress Evidence Resulting From Execution Of Search Warrant (Doc. 22) and Defendant Hayes's Motion To Suppress Statements (Doc. 23).  For the reasons discussed below, it is **RECOMMENDED** that Defendant Mealor's motion be **DENIED** and that Defendant Hayes's motion be **GRANTED**.

**Background**

An Indictment filed February 6, 2018 (Doc. 2) charges Defendants with carjacking in violation of 18 U.S.C. § 2119(1) and § 2 (Count One) and with possessing and brandishing a firearm during a carjacking in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and § 2 (Count Two).  Defendant Mealor moved to suppress evidence seized pursuant to a search warrant issued by the undersigned on December 20, 2017 which authorized the search of a 2001 Nissan Pathfinder registered to

1

Mealor's father (*see* Doc. 22-1).  (Doc. 22).  The Government filed a response to that motion (Doc. 27), but Mealor did not submit a reply.  Defendant Hayes moved to suppress statements he made to law enforcement agents on August 18, 2017 while he was being held in a Florida jail on Florida state charges.  (Doc. 23).  The Court held a hearing on Hayes's motion on June 15, 2018 (*see* Doc. 29), and a transcript was filed on June 25, 2018 (Doc. 33).[1]  Hayes filed a post-hearing brief (Doc. 35); the Government responded (Doc. 38); and Hayes replied (Doc. 39).  Briefing is complete, and the undersigned now considers the merits of Defendants' motions.

## Discussion

## I.      Defendant Mealor's Motion (Doc. 22)

Defendant moves to suppress evidence seized by law enforcement officers from a Nissan Pathfinder registered to his father pursuant to a search warrant issued by the undersigned on December 20, 2017 (Doc. 22-1) on the grounds that "the search warrant and its execution are unlawful because the agent both included material misrepresentations and omitted material information from his affidavit, in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)."  (Doc. 22 at 4).  Defendant also asserts that he has made a threshold showing worthy of a pretrial *Franks* hearing."  (*Id.* at 7).  The Government counters that Defendant has not shown that he has a legitimate expectation of privacy in the

---

[1] References to the transcript will be designated as "Tr. __."

Pathfinder because—as described in the search warrant affidavit—Defendant abandoned the Pathfinder because he fled the scene in a different vehicle and left the Pathfinder at the scene, from where it was towed and then stored for several months at the Hall County Sheriff's Office impound lot.  (Doc. 27 at 2-5).  The Government also argues that even if the Court reaches the *Franks* issue, Defendant has not shown that any alleged misrepresentations or omissions negate a finding of probable cause, nor has he made the "substantial preliminary showing" required to entitle him to a *Franks* hearing.  (*Id.* at 5-9).  Defendant did not reply to those arguments.

## A.   **Abandonment**

"Fourth Amendment claims do not lie when the defendant has abandoned the searched property."  *United States v. Johnson*, 806 F.3d 1323, 1341 (11th Cir. 2015).  "As our predecessor Court has explained, '[I]t is settled law that one has no standing to complain of a search or seizure of property has have voluntarily abandoned.' " *Id.* at 1342 (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc)); *see also United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987) ("Legitimate expectations of privacy can be abandoned.").  While a defendant "ha[s] the burden of establishing a legitimate expectation of privacy[,] the Government has the burden of proving abandonment."  *United States v. Elkins*, No. 1:16-CR-002406-ELR-JFK, 2017 U.S. Dist. LEXIS 86637, at *13 (N.D. Ga. Apr. 13, 2017), *adopted by* 2017 U.S. Dist. LEXIS 86542 (N.D. Ga. June 6, 2017).  Courts "assess

objectively whether abandonment has occurred, based primarily on the prior possessor's intent, as discerned from statements, acts, and other facts." *Johnson*, 806 F.3d at 1342. "The critical inquiry when determining whether an abandonment has occurred is 'whether the person prejudiced . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question.' " *Id.* (quoting *United States v. Ramos*, 12 F.3d 1019, 1022 (11th Cir. 1994)).

Here, Dudley Guice, Jr., a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), stated in the search warrant affidavit that in July 2017 he received information from the Hall County Multi-Agency Narcotics Squad (MANS) Unit that Defendants were identified as suspects in a robbery and carjacking on February 26, 2017 during which Defendants attempted to flee the scene in a gray 2001 Nissan Pathfinder that was registered to Mealor's father but Hayes backed the Pathfinder into a culvert. (Doc. 22-1 ¶¶ 3-5). The affidavit further states that Hayes and Mealor fled the scene in a Volkswagen Passat that belonged to the alleged victim, H. H., and they left the Pathfinder at the scene. (*Id.* ¶¶ 5, 11-12). At the time Agent Guice sought the search warrant, the Pathfinder remained at the Hall County Sheriff's Office Impound Lot. (Doc. 22-1 at 7). Defendant did not reply to the Government's contentions concerning his abandonment of the Pathfinder and contents and has not rebutted the description provided in the search warrant affidavit that he left the Pathfinder at the scene and fled in another vehicle.

In *Johnson*, the court noted that in applying the abandonment doctrine, the Eleventh Circuit has "determined, for example, that an individual who ditches property during a chase with law enforcement abandons that property and lacks standing to challenge the seizure of it," and has "similarly concluded that a person who makes a decision to leave his property containing contraband when law enforcement approaches or seeks to examine the property likewise abandons the property and loses standing to challenge its seizures."  806 F.3d at 1342.  "Indeed, we have found abandonment and consequently no standing even when a defendant chose to leave his property only because his life would have been endangered had he not done so." *Id.*  Here, the Government has shown that Defendant left his father's Pathfinder at the scene of the alleged carjacking after Hayes drove it into a culvert and then left the scene in another vehicle; the Pathfinder then remained at the impound lot for several months.   Under those circumstances, unrebutted by Defendant, the undersigned finds that Defendant abandoned his reasonable expectation of privacy in the Pathfinder and its contents and therefore **RECOMMENDS** that Defendant Mealor's motion to suppress be **DENIED**.

## B.   Probable Cause

Alternatively, even if Defendant had not abandoned the vehicle, the undersigned finds that probable cause supported the issuance of the search warrant, and his contentions about the affidavit's deficiencies based on *Franks* are

insufficient to justify holding an evidentiary hearing. "Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid." *United States v. Kilgore*, 2012 U.S. Dist. LEXIS 154148, at *14 (N.D. Ga. Sept. 13, 2012) (internal quotation omitted), *adopted by* 2012 U.S. Dist. LEXIS 153867 (N.D. Ga. Oct. 26, 2012). "It is not easy for a Defendant to meet this burden, and a judicial preference is accorded searches under a warrant." *United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 U.S. Dist. LEXIS 142717, at *86 (N.D. Ga. Nov. 22, 2010) (internal quotation omitted), *adopted by* 2011 U.S. Dist. LEXIS 42260 (N.D. Ga. Nov. 22, 2010).

"The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty." *L.A. County v. Rettele*, 550 U.S. 609, 615 (2007). The task of a magistrate judge, when issuing a warrant, " 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The *Miller* court explained the role of a court reviewing a search warrant:

> Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrate[ judges] in their probable cause determinations.

6

*Miller*, 24 F.3d at 1361 (citing *Gates*, 462 U.S. at 236-37).

Here, Agent Guice's affidavit states that the alleged carjacking victim, H. H., told investigators that at 4:30 a.m. on February 26, 2017, Hayes entered her home, pointed a pistol at her, asked "where is the money?" and then took keys to her 2006 Volkswagen Passat off her nightstand.   (Doc. 22-1 ¶ 4).   Although Hayes was wearing a mask, H. H. suspected the perpetrator was Hayes, with whom she was acquainted, based on his voice and demeanor.   (*Id.* ¶ 6).   H. H. also stated that she heard a voice from downstairs that said, "we have to go, we have company," and Hayes left.   (*Id.* ¶ 4).   The affidavit further states that Mealor and Hayes encountered T. E. and his daughter K. E. outside H. H.'s residence, and they "pistol whipped" T. E. with firearms.   (*Id.* ¶ 5).   Their masks fell off during this encounter, and K. E. recognized them and "identified them as the persons who assaulted her father."   (*Id.*).   Mealor and Hayes then attempted to flee the scene in the Nissan Pathfinder registered to Mealor's father, but Hayes backed the Pathfinder into a culvert and they then fled the scene in H. H.'s Passat and the Pathfinder remained at the scene.   (*Id.*).   According to a Hall County Investigative Police Report, items taken from H. H.'s residence were observed inside the Pathfinder, including a wallet, a laptop, a stylus, and a cellphone, and a second cell phone was also observed in the Pathfinder.   (*Id.* ¶ 7).

Guice's affidavit also includes statements obtained from Hayes[2] who told agents that on February 26, 2017, Mealor told Hayes that E. had taken Mealor's credit card, Mealor picked Hayes up in his father's Pathfinder, they went to a Walmart and bought a machete, bandanas, and other items, and then they went to H. H.'s residence. (*Id*. ¶¶ 9, 12). Mealor wore a mask and Hayes wore a bandana to cover their faces; Mealor had a .357 revolver, and he gave Hayes another handgun before entering the residence. (*Id*. ¶ 9). Once inside, Mealor started loading things into a bag and told Hayes to go upstairs and "get what he could get." (*Id*.). After Hayes encountered H. H., Mealor yelled that "somebody's here," so they left the house and saw a vehicle driving up the driveway. (*Id*. ¶¶ 9-10). Hayes stated that he hit T. E. with the side of his pistol and Mealor hit T. E with a baton he had retrieved from the Pathfinder. (*Id*. ¶ 10). Mealor took his mask off, and Hayes's bandana fell off. (*Id*.). Guice's affidavit also states that Hayes reported that Mealor had taken H. H.'s car keys but H. H. stated that it was Hayes who took the keys. (*Id*. ¶ 11). Hayes also stated that he and Mealor fled to Florida and that Mealor sold the gun he had given Hayes but might still possess the .357 revolver. (*Id*.) Hayes also stated that he thought he left his cellphone in the Pathfinder when he and Mealor

---

[2] As discussed below, the undersigned has recommended that Hayes's motion to suppress those statements be granted. The undersigned notes that even if Hayes's statements were not considered in evaluating Guice's affidavit, probable cause is still established by the other information presented, including witness statements.

abandoned it. (*Id.* ¶ 12). Guice also indicated that the Pathfinder was still at the Hall County Sheriff's Office impound lot. (Doc. 22-1 at 7).

The undersigned finds that Guice's affidavit sufficiently sets forth facts to establish probable cause to believe that the Pathfinder, which Defendants drove to the residence of the alleged carjacking victim after purchasing items used in the alleged offense and from which Mealor allegedly obtained a baton used to assault one of the witnesses, would contain evidence of a crime, including the items listed in Attachment B to the search warrant, i.e., cellular phones; firearms and ammunition; narcotics and paraphernalia; property that can be identified by H. H. as having been taken during the robbery; latent fingerprints; rope, zip ties, duct tape, or other items that can be used to bind someone; machete, knife or other instrument that could be used as a weapon; and any masks, bandanas, or other items that could be used to hide someone's identity. (Doc. 22-1 at 5).

Defendant argues, however, that Agent Guice included material misrepresentations and omitted material facts from his affidavit which "rendered the warrant invalid under *Franks*." (Doc. 22 at 5). "Entitlement to a *Franks* hearing requires a defendant to make a 'substantial preliminary showing' establishing (1) the affiant deliberately or recklessly included a false statement, or failed to include material information, in the warrant affidavit; and (2) the allegedly false statement or omission was necessary to the finding of probable cause." *United States v. Gray*,

544 Fed. Appx. 870, 882 (11th Cir. 2013) (unpublished decision) (citing *Franks*, 438 U.S. at 155-56). "The defendant's attack must be 'more than conclusory,' " and " '[a]llegations of negligence or innocent mistake are insufficient.' " *Id.* (quoting *Franks*, 438 U.S. at 171). "Allegations of deliberate falsehood or reckless disregard for the truth 'must be accompanied by an offer of proof.' " *United States v. Rousseau*, 628 Fed. Appx. 1022, 1023 (11th Cir. 2015) (unpublished decision) (quoting *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006)). Moreover, " 'even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.' " *Gray*, 544 Fed. Appx. at 882 (quoting *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997)). "[T]he defendant must show that, if the misrepresentations were removed from, or the omitted facts were included in, the warrant affidavit, then probable cause would be lacking." *Rousseau*, 628 Fed. Appx. at 1023. "If the warrant would still support probable cause, then no hearing is necessary." *Id.*

Defendant points out that the affidavit states that both Defendants "pistol whipped" T. E. and both assaulted him (*see* Doc. 22-1 ¶ 5), but he asserts that "this statement does not comport with the reports of the victims, who described that only Mr. Hayes 'pistol whipped' and assaulted Mr. E." (Doc. 22 at 5-6). Defendant did not, however, accompany that assertion with an offer of proof, such as the witness statements. Moreover, even if the affidavit had stated that only Hayes assaulted T.

E., probable cause would still exist to believe that evidence of a crime would be found in the vehicle in which the men traveled to H. H.'s residence and in which they attempted to flee after leaving H. H.'s residence.

Defendant also contends that "Agent Guice failed to disclose that some or all of the witnesses were drug users and may have been using heroin or other drugs at the time they gave their statements to officers," and "[t]his drug use, and especially the current intoxication at the time of making statements, may have affected the witness's impressions and recall of events." (Doc. 22 at 6). Defendant also asserts that "Agent Guice failed to disclose in the affidavit that, upon information and belief, witnesses have made statements that conflict with their statements the night of the offense and/or statements exonerating Mr. Mealor." (*Id.*). These wholly conclusory assertions, devoid of any factual proffer to support them, are insufficient to demonstrate the probable cause was lacking or that Defendant is entitled to a hearing under *Franks*. *See, e.g.*, *United States v. Green*, No. 4:09-CR-34-RLV-WEJ, 2010 U.S. Dist. LEXIS 150519, at *14-15 (N.D. Ga. Apr. 13, 2010) (explaining that "[a]llegations of deliberate falsehood must be accompanied by an offer of proof, such as affidavits or sworn or otherwise reliable statements of witnesses (or their absence satisfactorily explained)" and finding that the defendant had made no such offer of proof).

11

Because probable cause supported the issuance of the search warrant and Defendant Mealor has not shown materially false statements or material omissions in Agent Guice's affidavit that would negate a finding of probable cause, he has not shown entitlement to a hearing under *Franks* or suppression of evidence seized from the Nissan Pathfinder at issue.   Accordingly, it is **RECOMMENDED** that Defendant Mealor's Motion To Suppress Evidence Resulting From Execution Of Search Warrant (Doc. 22) be **DENIED**.

## II.   Defendant Hayes's Motion (Doc. 23)

Defendant moves to suppress statements he made to law enforcement agents on August 18, 2017 while he was in custody in Florida on the grounds that his waiver of his right to remain silent was not voluntary, knowing and intelligent as required by *Miranda v. Arizona*, 384 U.S. 436 (1966) and because his statements were not voluntarily given in violation of Fifth Amendment.  (Doc. 23).

### A.   Facts[3]

---

[3] These facts are taken from the hearing testimony of ATF Special Agent Dudley Guice and the recording of the agents' August 18, 2017 interview of Defendant (Gov't Ex. 2).   The recording (Gov't Ex. 2) starts at "very beginning of the interview" and is broken into four segments because the agents paused the recording during breaks; everything that Defendant said during the interview is captured on the recording. (Tr. 15-17).  The parties did not provide a transcript of the recording, so the undersigned has attempted to refer to the approximate time counter markings when citing to specific statements.  *See, e.g.*, *United States v. Spinks*, No. 1:16-cr-00015-14-AT-JSA, 2016 U.S. Dist. LEXIS 176756, at *6 (N.D. Ga. Sept. 28, 2016) ("As there is no transcript of the recording, the Court will refer as best as possible to

In the summer of 2017 Agent Guice received a referral from the Hall County MANS Unit concerning a case involving Defendants Hayes and Mealor, i.e., "a carjacking [and] robbery that took place at a [H. H.'s] residence in Hall County" which "involved holding an individual at gunpoint and taking a car, carjacking." (Tr. 5-6, 19-20). Guice ran the criminal histories on both Defendant, reviewed the Hall County incident report that was created when the incident occurred, and interviewed witnesses. (Tr. 6). When he ran Mealor's criminal history Guice learned that he was "locked up . . . in reference to an extensive criminal history." (Tr. 6-7). He also learned that Defendant Hayes was being held at a jail in Panama City, Florida on Florida state charges, and Hall County had a hold on Hayes based on the carjacking charge. (Tr. 7).

Guice and ATF Special Agent Spence Burnett traveled to Florida in mid-August to interview Defendant Hayes at an interview room at the jail. (Tr. 7-9). As far as Guice knew, Defendant would not have had any reason to know that they were coming down to interview him about the carjacking. (Tr. 9). The room had a table and three chairs, and Defendant sat on the opposite side of Agents Burnett and Guice with his hands handcuffed in front of him. (Tr. 9, 23). The agents were dressed in

the approximate time counter markings for certain statements."), *adopted by* 2016 U.S. Dist. LEXIS 175934 (N.D. Ga. Dec. 19, 2016).

casual clothes with badges displayed, but neither was armed.  (Tr. 10-11). The

interview was recorded.  (Tr. 11-12, 14-15; Gov't Ex. 2).

At the beginning of the interview Agent Guice read Defendant his *Miranda*

rights from Burnett's *Miranda* card:

> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer before we ask you any questions
> and to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you if you wish
> before questioning begins.
> If you decide to answer any questions now without a lawyer present,
> you have the right to stop answering at any time.

(Tr. 14, 23-24; Gov't Exs. 1, 2).  Guice also had Defendant read aloud the last right,

i.e., "If you decide to answer any questions now without a lawyer present, you have

the right to stop answering at any time."  (Gov't Ex. 2).  Guice did not bring a

*Miranda* waiver form with him and offered the following reasons for not doing so:

"Honestly, it slipped my mind.  We was in somebody else backyard and I wasn't

able to bring those with me."[4]  (Tr. 14).  It is undisputed—and the interview

recording shows—that Defendant did not acknowledge his *Miranda* rights; the

agents did not ask him if he understood them; Defendant never stated that he

understood them; the agents did not ask Defendant if he waived his rights; Defendant

---

[4] Agent Burnett did not testify at the hearing, so his reasons for not providing a
*Miranda* waiver form are unknown, but it is readily apparent that no *Miranda* waiver
form was provided to or signed by Defendant.

never stated that he waived his rights; and Defendant was not presented with and did not sign a form acknowledging that he understood those rights and waived them. (Tr. 24; Gov't Ex. 2).

Defendant's initial responses to the agents' questions apparently indicated to the agents that he was not being totally forthcoming or truthful about the carjacking, so at the approximate 10 minute mark, Agent Guice told Defendant, "I'm really trying to help you but you gotta help me," and he then explained to Defendant how such factors as "acceptance of responsibility" can reduce a federal sentence. (Gov't Ex. 2). Guice also told Defendant to tell them his "side" because all they had was Mealor's "side." (*Id*.). The agents had not in fact interviewed Mealor (Tr. 21-22), and Guice admits that he told Defendant "several times during the interview, falsely, that Mr. Mealor had already identified him as the main perpetrator in the crime that's been charged" because "[i]t's a tactic that we use" (Tr. 25).

Burnett also explained to Defendant that there is no parole in the federal system, and "acceptance of responsibility" in the federal sentencing guidelines can reduce one's sentence. (*Id.*). He also told Defendant that they could tell the U.S. Attorney's Office that Defendant "lied his ass off" or they could tell the U.S. Attorney that this was Mealor's "deal" and Defendant just got "sucked in." (*Id.*). The agents continued to tell Defendant that they needed to know his "side" and not just Mealor's version, and Guice showed Mealor's "rap sheet" to Defendant and told

him that Mealor "has nothing to lose by throwing you under the bus." (*Id*.).  At

approximately 14 minutes into the interview Guice repeated that they had already

spoken to Mealor—the "first person we talked to"— who identified Defendant as

"the mastermind." (*Id*.).  Guice then told Defendant:

> I'm giving you an opportunity to tell me exactly what happened.  Even
> if shit seems like it is incriminating to you bro, we ain't here to charge
> you with no bullshit bro.  Like we ain't here to charge you at all.  If you
> can be honest in whatever you say and it somewhat seems like we kinda
> already know what happened, we can live with that.  Then we can shift
> focus here.  But when you tell us some 100 percent facts and then skip
> two steps, that don't work well.

(*Id*.).   In response Defendant expressed concern about "incriminat[ing] myself."[5]

(*Id*.).  The agents then informed Defendant what the Hall County, Georgia charges

against Defendant were, and at the 17 minute mark Guice told Defendant that he was

in a "good situation" since the agents were federal agents and could tell the AUSA

"this is what really happened, this is the evidence supporting what happened,

contradicting what this young man [presumably Mealor] said." (*Id*.).  In response,

Defendant asked, "How do I get a guarantee that I won't get railroaded?" to which

Guice responded, "I can guarantee you won't get railroaded because the facts speak

for theyself," that they were there because they felt like Mealor was not telling the

truth, and if they had believed Mealor, they "wouldn't even be having this

---

[5] At the hearing Guide agreed that "possibly" Defendant "expressed concern about
incriminating himself" several times during the interview.  (Tr. 25).

conversation" because they would have charged Defendant." (*Id.*).   Burnett also

explained, "Here's what happens in a federal system.   First person on a bus gets the

best seat.   So he lied his ass off.   Cool.   He ain't got a seat.   But here's how this goes.

Let's say you do get charged federally.   I'm not going to say you aren't going to be

charged federally.   You might." (*Id.*).   The agents explained that if Defendant got

charged by the U.S. Attorney's Office with carjacking "for whatever reason," the

maximum sentence is 25 years.   (*Id.*).   Burnett also told Defendant that the AUSA

would be "much more likely" to take Burnett's recommendation if he can say, "this

is fucked up, it went sideways, [Mealor] was really the one driving this, this was his

idea, [Defendant] was in the wrong place, wrong time," and the AUSA would be

"more willing to say, "let me call the prosecutor in Dade County, let me talk to Hall

County DA's Office," than if Burnett told the AUSA that Defendant was only honest

with them "right up until it went sideways." (*Id.*).

    At approximately 21 minutes into the interview Guice said, "I understand.

You don't want to incriminate yourself but it ain't about incriminating yourself,

right.   Would I rather shake the dice and do 25 years or would I shake the dice and

do two to three?" (*Id.*).   Defendant responded, "If I can be assured . . . that I get the

lesser," to which Burnett explained that they could not promise him anything, e.g.,

he could not promise Defendant that Mealor would get 20 years and Defendant

would get three months; in the federal system the judge decides the sentence; and

the sentencing takes into account factors such as acceptance, cooperation, etc. (*Id.*).

Burnett then gave an example of a home invasion case he worked on with four

defendants with equal culpability where three refused to give statements, went to

trial, were convicted, and were sentenced to 15, 20, and 25 years, while the fourth

defendant told "it all" and received a four-and-a-half year sentence. (*Id.*). Burnett

said, "So I'm not going to tell you you're going to walk out of here scot free, and

nobody can tell you that, and they shouldn't . . . , if they do they are lying to you."

(*Id.*). The agents then repeated their assertion that Mealor had told them what

happened and blamed Defendant for everything. (*Id.*).

At approximately 25 minutes into the interview, Burnett said, "Here's the

deal. It is your absolute constitutional right. I'm not playing hide the ball. I'm sure

you don't love the police. But it's your right to say 'nah, I'd rather take it back to

the pod. I'm out.' Take your charges whenever you get done here and they extradite

you back to Georgia and then you go through the system and then you and [Mealor]

can sit there at federal trial together" because carjacking is a federal crime. (*Id.*). At

approximately the 27-minute mark, Defendant said he was "going to keep it real"

and made statements about the events of February 26, 2017, including incriminating

statements about his own involvement in those events. (*Id.*). Defendant continued

denying that he had a gun during the incident, and shortly after returning from a

break Burnette told him:

> Here's a secret about getting charged with a gun federally.  I gotta have the gun.  In a state, in Georgia, you can get charged with possession of a firearm during the commission of a felony or possession of a firearm by a convicted felon even if the police don't recover the gun.  Federally, I gotta have it.  You ain't got caught with no gun.  So legally, I can't even charge you with a gun.  So you ain't got one.  So unless you dropped it there . . . .

(*Id.*).  Defendant later admitted the he possessed a firearm during the incident.  (*Id.*).

At no point during interview did Defendant tell the agents that he wanted to assert his Fifth Amendment right to remain silent and not answer their questions, and he never asked for an attorney to be present.  (Tr. 17; Gov't Ex. 2).  The agents did not verbally or physically threaten Defendant or deny him food, water, or a bathroom trip.  (Tr. 18).  The interview lasted two to three hours.  (Tr. 22-23; Gov't Ex. 2).

## B.   **Discussion**

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Id*. at 444.  Specifically, before a person in

custody[6] is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id*. at 467-73. "The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda*[,] and were otherwise voluntary." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1372 (N.D. Ga.), *adopted by* 859 F. Supp. 2d 1335, 1343 (N.D. Ga. 2012).

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010); *see also United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010 (explaining that a defendant may waive his *Miranda* rights, "but only if 'the waiver is made voluntarily, knowingly and intelligently.' " (quoting *Miranda*, 384 U.S. at 444)). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both

---

[6] The parties do not dispute that Defendant was in custody for purposes of *Miranda* when Agents Guice and Burnett interviewed him.

the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Thompkins*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  The Government bears the burden of proving both "dimensions" by a preponderance of the evidence.  *Bushay*, 859 F. Supp. 2d at 1372 (citing *Thompkins*, 560 U.S. at 384); *see also Bernal-Benitez*, 594 F.3d at 1318 ("The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.").  "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also Bushay*, 859 F. Supp. 2d at 1373 ("A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension.").  "The prosecution . . . does not need to show that a waiver of *Miranda* rights was express," however.  *Thompkins*, 560 U.S. at 384.  "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence."

Having listened to the recording of the agents' interrogation of Defendant and considering the totality of the circumstances, the undersigned finds that the Government has not met its burden of proving by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived his rights under

*Miranda*.  Specifically, the undersigned finds that the Government has not shown that Defendant waived his right to remain silent with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Thompkins*, 560 U.S. at 382-83.

Although Agent Guice read the *Miranda* rights from a card to Defendant at the beginning of the interview, Defendant did not sign a *Miranda* waiver form indicating that he understood his rights and waived them; the agents did not ask Defendant if he understood his rights or if he waived them; and Defendant did not state that he understood his rights and that he wanted to waive them.  (Gov't Ex. 2). It is true that, as the Supreme Court explained in *Thompkins*, the Government "does not need to show that a waiver of *Miranda* rights was express."  560 U.S. at 384.  It is also true that Defendant was advised of his *Miranda* rights and ultimately responded to the agents' questions about the carjacking at issue, including his own involvement in those events, thus potentially indicating that he implicitly waived his right to remain silent.  But the Court in *Thompkins* also cautioned that "[i]f the States establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, *standing alone*, is insufficient to demonstrate a 'valid waiver' of *Miranda* rights."  560 U.S. at 384 (emphasis added).  "The prosecution must make the additional showing that the accused understood these rights."  *Id.* The undersigned finds that Government has failed to make that showing.

First, as discussed above, there is no evidence that Defendant expressly stated that he understood his *Miranda* rights. Moreover, the recording of the agents' interview show that they made inconsistent, confusing, and contradictory statements to Defendant throughout the interview concerning the consequences Defendant faced if he spoke with the agents, including making incriminatory statements. Even though the agents initially advised Defendant that he had a right to remain silent and that "anything you say can be used against you in court," they did not then ascertain his understanding of his right to remain silent or obtain his express waiver of that right. Instead, they made several representations to Defendant throughout the interview about the potential benefits of Defendant telling them his "side" of the story—to refute Mealor's (non-existent) statements placing the blame on Defendant, to avoid a joint federal trial with Mealor, to possibly reduce his sentence, to possibly obtain the assistance of the AUSA with various state prosecutors—while minimizing the consequences of making those statements and thus contradicting their *Miranda* warnings. Guice even told him "Even if shit seems like it is incriminating to you bro, we ain't here to charge you with no bullshit bro. Like we ain't here to charge you at all." (Gov't Ex. 2). In an effort to get obtain Defendant's admission that he had possessed a firearm during the alleged carjacking, Burnett falsely told Defendant that if they did not have the gun, they could not charge Defendant with possession of it, thus at least implying that any admission that he had a gun could not hurt him

23

if they did not have the gun.[7]  "It is well established that the police can undermine the voluntariness of a suspect's decision to waive his rights and confess, by falsely assuring or suggesting to a suspect that his statements could not hurt him."  *United States v. Barber*, No. 1:13-CR-343-WBH-JSA, 2015 U.S. Dist. LEXIS 121236, at *18-19 (N.D. Ga. June 25, 2015) (collecting cases), *adopted by* 2015 U.S. Dist. LEXIS 120775 (N.D. Ga. Sept. 10, 2015).

The undersigned acknowledges that Burnett told Defendant they could not promise him a reduced sentence if he gave a statement, but in that same exchange Burnett described a case where the defendant who talked to law enforcement received a greatly reduced sentence even though his participation had been the same as the other defendants who received sentences of 15, 20, and 25 years.  Even after Defendant had expressed his concerns about incriminating himself, Guice told him, "I understand.   You don't want to incriminate yourself but it ain't about incriminating yourself, right.  Would I rather shake the dice and do 25 years or would

---

[7] The Government does not dispute that Agent Burnett's statement that he could not charge Defendant with possession of a firearm during the commission of a felony unless the firearm is recovered is false and contends that it rendered Defendant's statement that he had possessed a firearm to be involuntarily made.  (Doc. 38, Gov't Br. at 17-18).  Therefore, the Government asserts that that statement (but only that statement) should be suppressed.  (*Id.*).  The undersigned has considered Burnett's statements about not charging Defendant with possession of a firearm to be part of the totality of the circumstances of the interrogation that demonstrate that the agents misled Defendant throughout his interrogation about the nature of his right to remain silent and the consequences of abandoning that right.  Therefore, all of Defendant's statements should be suppressed, not just his admission that he possessed a firearm.

I shake the dice and do two to three?"  The Government also asserts that "Agent Burnett reminded defendant that it was his constitutional right to remain silent and that he could go to trial with Mealor as his co-defendant in federal court."  (Doc. 38 at 5).   But the context and phrasing of Burnett's "reminder" implied the consequences for invoking his right not to talk to the agents were that Defendant would "take [his] charges" and go to federal trial with Mealor, a person who the agents repeatedly and falsely described as having implicated Defendant as the "mastermind" and primary culprit in the events under investigation.  One reasonable reading of Burnett's statements is that he was implying that if Defendant asserted his right to remain silent he would be charged with federal carjacking and tried jointly with Mealor (which might or might not actually happen), while if he did not assert that right he might avoid those consequences (which arguably contradicts the *Miranda* warning).

The agents' implications and representations concerning the consequences of Defendant waiving his right to remain silent—even if he made incriminating statements—thus ranged from not being charged to possible assistance with state prosecutors to substantial reduction of a federal sentence, while the consequences of asserting that right could lead to charges and a joint federal trial with Mealor, who purportedly identified Defendant as being "the main perpetrator" in this case.  The undersigned finds that under the totality of the circumstances—i.e., Defendant never

25

stated that he understood his *Miranda* rights or that he waived them and the agents made confusing and contradictory representations to Defendant about the consequences of waiving his right to remain silent—the Government has not met its burden of proving that Defendant voluntarily waived his right to remain silent with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Thompkins*, 560 U.S. at 382-83. Persuasive authority supports that finding.

In *Hart v. Attorney General for the State of Florida*, 323 F.3d 884(11th Cir. 2003) the Eleventh Circuit acknowledged that (unlike in this case), the detective "went to great lengths to apprize Hart of his rights," he went over the *Miranda* waiver form and explained each warning, and Hart signed the form indicating that he understood each right and was willing to talk to the detective without a lawyer. *Id.* at 893.  Nevertheless, the court found that under the totality of the circumstances, the defendant's written waiver of his *Miranda* rights was "the product of deception and was not 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* (quoting *Moran*, 475 U.S. at 421).  The court noted that after the defendant signed the waiver form, he initially denied knowing anything about the homicides at issue, and the detective informed him that he had a witness who identified defendant as being present. *Id.* at 894.  Hart then asked to speak with another detective, Schuster,

26

because he trusted her, and during a colloquy between the defendant and Schuster, defendant asked her "for a clarification of his right to counsel, and Schuster responded by telling him that the disadvantage of having a lawyer present was that the lawyer would tell Hart not to answer incriminating questions." *Id.* The court observed, "The reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self[-]incrimination, yet, Schuster in effect told Hart that this was the disadvantage of having a lawyer." *Id.*

The court also noted that Schuster told the defendant that "honesty wouldn't hurt him," which the court found "contradicted the *Miranda* warning that anything he said could be used against him in court." *Id.* "The phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you say can be used against you in court.' " *Id.* "The former suggested to Hart that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt." *Id.* The court found, "Given the totality of the circumstances surrounding the interrogation, which include Hart's trust of Schuster and Schuster's statements contradicting the *Miranda* warnings, we cannot say that Hart's decision to waive his rights and confess was voluntary, knowing, and intelligent. His decision to waive his rights and confess was the product of Schuster's deception and, as a result of her contradictory statements, he did not truly understand the nature of his right against

27

self-incrimination or the consequences that would result from waiving it." *Id.* at 895.

In *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010), the court found that a detective's statement "that he was not going to pursue any charges against him" contradicted his previously given *Miranda* warnings such that "Lall 'did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it.' " *Id.* at 1283-84 (quoting *Hart*, 323 F.3d at 895). Similarly, in *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991), a case cited in *Lall* and *Hart*, the court found that the defendant had not validly waived his *Miranda* rights because the FBI agents told him that "signing the waiver form would not hurt him," which "contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent." *Id.* at 1435; *see also Barber*, 2015 U.S. Dist. LEXIS 121236, at *23 (finding that the detective's statement to the defendant that "[t]here's nothing going to happen to you, I promise you that" was "objectively misleading and contradictory to" the *Miranda* warnings the detective had previously given the defendant).

Given the totality of the circumstances surrounding the interrogation in this case and guided by persuasive authority confronting similar circumstances, the undersigned finds that the Government has not met its burden of proving that

Defendant voluntarily, knowingly, and intelligently waived his right to remain silent when questioned by agents on August 18, 2017.  It is therefore **RECOMMENDED** that Defendant Hayes's motion to suppress evidence of his custodial statements (Doc. 23) be **GRANTED**.

## Summary

**IT IS RECOMMENDED** that Defendant Mealor's Motion To Suppress Evidence Resulting From Execution Of Search Warrant (Doc. 22) be **DENIED** and that Defendant Hayes's Motion To Suppress Statements (Doc. 23) be **GRANTED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 9th day of October, 2018.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge